IN

# THE SUPREME COURT

OF

# PENNSYLVANIA.

EASTERN DISTRICT, MARCH TERM, 1834.

Case of the accounts of SITER and Another, Guardians of JORDAN.

### APPEAL.

A deed by a husband conveying the wife's choses in action to trustees for the benefit of the wife and her child, though not a reduction of such choses in action into possession, nevertheless passes not only the interest of the husband, but that of the wife also, to the trustees, upon the trusts declared in the deed. Consequently, upon the death of the husband, such choses in action do not survive to the wife, so as to entitle a husband whom she has subsequently married to claim them as her property.

THIS was an appeal from the decree of the Orphans' Court of *Chester* county, confirming the guardianship account of the appellees, *Edward Siter* and *Dewalt Beaver*, guardians of *Ann Jordan* late *Siter*. The appeal was taken by *Hiram Taylor*, who after the death of her first husband, *Jordan*, intermarried with the ward.

The facts material to the point made here were these. *Adam Siter*, the father of the ward, died in 1799, intestate, and leaving real and personal estate, a widow and children. In 1803, the appellees were appointed gardians of the person and estate of his daughter *Ann*, then an infant under the age of fourteen years, and subsequently intermarried with *John M. Jordan*. In the settlement of their account, they took credit for three thousand six hundred and sixteen dollars, and seventy-eight cents, retained by them as *trustees* for their ward, and her son *Andrew M. Jordan*, under a deed executed by her husband *John M. Jordan*, on the twenty-third day of *October*, 1817, in the words following : " Know all men by these presents, that I, *John M. Jordan*, late of *Blockley* township, *Philadelphia* county, and state of *Pennsylvania*, do hereby acknowledge to have received of *Edward*

(Siter and Another, Guardians of Jordan.)

*Siter* of *Radnor* Township, *Delaware* county, and *Dewalt Beaver* of *Tredyffrin* township, *Chester* county, both of the state aforesaid, guardians duly appointed for the minor children of *Adam Siter* deceased, the sum of three thousand two hundred and seventy-one dollars and ninety-two cents; in consideration whereof, and for the love and regard which I have and bear towards my wife *Ann*, and child *Mitchel Jordan*, together with other good causes me thereunto moving, do hereby, and by these presents, assign, transfer, set over, convey and dispose of, all my right, title, claim and demand whatsoever, of, in, and to the residue of my share which I claim through my wife, out of the estate of my late father-in-law *Adam Siter* deceased, together also with my mother-in-law's dower after her decease, (excepting and reserving only as is hereinafter reserved and excepted) unto *Edward Siter* and *Dewalt Beaver*, hereinbefore mentioned, in trust, and for the uses and purposes as followeth, that is to say, the aforesaid *Edward Siter* and *Dewalt Beaver*, for the trust and confidence placed in them, do hereby bind themselves, their heirs, executors and administrators, to pay the interest annually arising from the residue of the aforesaid share and dower, unto my wife *Ann Jordan* for her use and support, as also for bringing up and supporting our son *Mitchel*, for and during the natural life of the said *Ann*, and after her decease, to our said son *Mitchel*, if he should be of age at the decease of the mother, or as soon as he arrives to the age of twenty-one years, the principal; and for the better securing the residue of the aforesaid share, for the uses and purposes hereinbefore mentioned, I do hereby, for myself, my executors and administrators, assign, transfer, set over, convey, and dispose of the same unto the aforesaid *Edward Siter* and *Dewalt Beaver*, their heirs, executors and administrators, in trust, and for the uses and purposes hereinbefore mentioned. In witness whereof," &c.

After the execution of this deed, the husband, who was previously intemperate and had squandered the greater part of his wife's property, deserted her, and has not since been heard of. Subsequently to the lapse of the period prescribed by the act of assembly, as necessary to raise a legal presumption of his death, she intermarried with *Hiram Taylor* the appellant.

On the first of *April*, 1807, *Dewalt Beaver*, one of the appellees, had in his hands seven hundred and twenty-five pounds, eight shillings and ten pence, part of the estate of his ward. *Edward Siter*, the other appellee, and one of the children of the decedent, had previously accepted for himself, a messuage and one hundred and sixteen acres, called the Eagle property, parcel of the real estate, appraised at sixteen thousand eight hundred dollars, and given bonds to the other children for their portions of the valuation money. *William Siter*, another child, had accepted the residue of the real estate, given bonds likewise to the other children, and conveyed the part so accepted by him to *Edward* who had assumed all the responsibilities incurred by the acceptance of it. *Edward* being thus indebted for the real estate, on the first of *April*, 1807, was charged by himself and

(Siter and Another, Guardians of Jordan.)

his fellow guardian in the guardianship book of entries, with the moneys due to their ward on the bonds given for her portion of the valuation money. The appellees continued to charge themselves on the guardianship account with moneys received, and to credit themselves for moneys paid out, after the execution of the deed of trust, by entries made at various times, till the book was closed on the first of *April*, 1818. The widow was living at the execution of the deed of trust.

The estate of the wife consisting at that period, of choses in action, had therefore not been reduced to possession by the husband, a part of it being actually or potentially in the hands of the appellees to whom the deed was made, and the residue secured by bonds receivable at the death of her mother. The question was, whether the deed of trust passed no more than the husband's right of reduction into possession during his lifetime; or whether it passed the interest of the wife, and consequently entitled the trustees to retain for the purposes of the trust after his death.

The cause was argued at *December* term last, by *Cohen* and *Kittera* for the appellant, and by *Dillingham* for the appellees. The court having ordered a re-argument it was argued again at this term, by *Cohen* (with whom was *Kittera*,) on behalf of the appellant.

*Bell* and *Dillingham* for the appellees were relieved by the COURT, whose opinion was delivered by

GIBSON, C. J.—The objection to this settlement is rested on the authority of *Hartman* v. *Dowdle*, 1 *Rawle*, 279, which requires a valuable consideration for the contract of equitable assignment, in order to bar the wife's survivorship. It certainly was decided there, and on indisputable authority, that an equitable assignment is executory, whether it purports to be an agreement or a conveyance of the title; and that it is not to be executed in favour of a volunteer, against the conjugal rights of the wife. But would a chancellor withhold his assistance from what this palpably is, a settlement for the advantage of the wife herself, and in restraint of the husband's power to squander the fragments of her estate? That it is not for her exclusive benefit, but for that of her child also, is no obstacle to the execution of it; for where a provision is ordered out of the equitable choses of a wife, though the equity which is the foundation of it is inherent in her person and not a separate ground of claim by her children after her waiver of it or death, the children are nevertheless included. This is a reasonable settlement, out of the wife's own property, on herself and her child; and it would be a narrow construction of the marital powers of the husband, that would suffer the trust to fail for an omission to reduce the fund into actual possession before the execution of the instrument. The decision might be rested here; but as the soundness of the decision in *Hartman* v. *Dowdle* is questioned in relation to cases even where there is in fact a valuable consideration, it is perhaps necessary, but certainly proper,

(Siter and Another, Guardians of Jordan.)

to examine the principle started in *Hornsby* v. *Lee*, 2 *Mad.* 16, sustained in *Purdon* v. *Jackson*, 1 *Russel*, 1, and followed in *Honner* v. *Morton*, 3 *Russel*, 298 ; as it is upon the authority of these cases that the question is made. And this seems the more necessary, as these decisions, not being quotable as precedents here, and consequently not being open to the scrutiny of counsel, might otherwise make a false impression on the mind of the profession. The worst consequence of the act to exclude British precedents since a particular period, is, that they sometimes pass with the judges for more than they are worth. They are always examined at the chambers of the judges ; and the object of the act is certainly not promoted by refusing the party to be affected by them an opportunity to contest their principles. Certainly they ought to have no authority here as precedents, and the inclination of the judges to regard them as such has passed away ; but they are entitled to consideration for whatever of reason and sense they contain, and they might in that respect be safely put on a footing with other European decisions. Where, however, they happen to be unfounded in principle, the judges can do no better service to the cause of jurisprudence, than by pointing it out. In weighing the arguments in support of these three decisions, then, it will be necessary to try them by their consistency with general principles and with other decisions of the same court.

In considering the question on the ground of authority, I will first state those *dicta*, for there was no decision of the point previous to *Hornsby* v. *Lee*, which might seem to make in favour of the wife. But it is proper to premise, that there is a class of cases usually brought into the discussion, which are inapplicable to any thing but an entirely different subject—her claim to a provision out of her equitable choses in action which, lying originally in the exclusive jurisdiction of the chancellor, enable him to set what price he he pleases on the equitable assistance necessary to the husband in order to get at them. Of these, the chancellor may settle a part or the whole on the wife, according to her necessities or his own notions of propriety, though it is to be admitted, that the residue after provision made, is usually disposed of in analogy to her rights over her legal choses. But the right to her equitable choses is founded, not on her survivorship, which is a legal title of which she cannot be deprived, even by her consent signified in court, but on the chancellor's discretion ; for she may urge it against the husband himself, on what is called " the wife's equity ;" and these equitable choses therefore differ from her legal choses, which the husband, or his legal assignee, may recover without equitable assistance, but which, when only equitably assigned, require the help of a chancellor, to put the assignee in the place of the assignor. For this last quality, they also, are sometimes, but improperly, called the wife's equitable choses in action, as by Mr. *Roper*, in his treatise on property, though he subsequently considers her equity as appertaining to choses for the recovery of which there is no legal remedy in the hus-

band's name, or that of any one else, and not to cases in which the assignee is the equitable owner of a legal title. Of this class is *Like* v. *Beresford*, 3 *Ves.* 512, where an assignee, though for value, was postponed, because there was no legal ownership on either side to control the chancellor's discretion. Many others of the same stamp are occasionally brought into the argument, with no other effect than to add entanglement to complexity. I therefore dismiss them to turn to those which touch the point more nearly.

The earliest of them is the well known case of *Burnett* v. *Kinaston*, *Prec. in Ch.* 118, in which the Lord Keeper is reported to have said, that "if a husband assign a bond of his wife *for a valuable consideration*, this assignment will not bind the wife if she survive ; for the wife claims paramount." This, however, was not the point decided, the settlement being in fact a voluntary disposition, which is conceded on all hands not to bind the wife, even if it binds the husband; and beside, the report of the same case in 2 *Vern.* 401, has no such *dictum*. The next is *White* v. *St. Barbe*, 1 *Ves. & Bea.* 405, which contains what might be thought an intimation to the same effect, deducible from the generality of an assertion made by the Master of the Rolls, Sir WILLIAM GRANT, that the husband can dispose of his wife's chose in action 'against every one but the wife surviving.' This also was but a *dictum*, and it will be seen by other *dicta* of the same able judge, that he supposed the generality of the rule might be qualified by the nature of the consideration. These two *dicta*, with perhaps a doubt thrown out by Lord HARDWICKE, in *Ives* v. *Medcalfe*, 1 *Atk.* 63, and *Bush* v. *Delway*, 1 *Ves. Sr.* 19 ; 3 *Atk.* 330, make up the sum of authority to be brought in aid of the two decisions of Sir THOMAS PLUMER in *Hornsby* v. *Lee*, and *Purdon* v. *Jackson*; and that of Lord LYNDHURST, in *Honner* v. *Morton*, 3 *Russel*, 65.

It has been said that no case can be found in which the contrary was directly decided as the immediate point of the cause. In *Atkins* v. *Dawbury*, *Gilb. Eq. Rep.* 88, it was directly determined that even a voluntary assignment binds the wife; and though it is to be admitted, that the doctrine was carried beyond the principle which regulates equity in the execution of such agreements, the decision clearly evinces an opinion favourable to the general power of the husband. However, in *Bates* v. *Dandy*, 2 *Atk.* 207, the precise question arose, and was decided as the turning point of the cause. Two mortgages, handed over to the husband of an intestate's daughter by the administrator, pursuant to an amicable distribution of the estate, were delivered by the husband to one from whom he obtained money, on an agreement to assign them ; but they were not legally assigned either by the husband or the administrator. From the opinion of Lord HARDWICKE, appended to *Honner* v. *Morton*, 3 *Russel*, 301, it appears the wife was the sister, not a daughter of the decedent ; and that she claimed, not through an intestacy, but as one of three residuary legatees—a difference not material to the question. The hus-

(Siter and Another, Guardians of Jordan.)

band dead, the assignee brought a bill against the wife and the husband's administrator, to be paid his money or have the mortgage foreclosed, and Lord Hardwicke established his right to the extent of the money advanced, expressly because the husband's equitable assignment barred the wife's title to the extent of the consideration. It cannot be said that this is not a case in point, because the chancellor sustained the wife's title to the surplus against the husband's administrator.    That barely proves that he executed the assignment, no further than there was value to support it, leaving it, as regards the residue, to its legal consequences between the wife and her husband's representative.    The case is undoubtedly in point, and one of the highest authority; in addition to which, we have a recognition of the principle by the same judge, in *Grey* v. *Kentish*, 1 *Atk.* 280, and *Hawkyns* v. *Obyn*, 2 *Atk.* 549; by Lord King in *The Duke of Chandos* v. *Talbot*, 2 *P. Wms.* 608, and *Carteret* v. *Paschal*, 3 *P. Wms.* 200; by Lord Bathurst in *Gayner* v. *Wilkinson*, *Dickens' Rep.* 491; by Lord Thurlow, in *Saddington* v. *Kinsman*, 1 *Bro. Ch.* 51, and *Worral* v. *Marlar*, 1 *P. Wms.* 459 (note); by Lord Alvanley, in *Hewit* v. *Crowcher*, cited in 12 *Ves.* 175, and *Gregg* v. *Crowcher, Id.*; by Sir William Grant, in *Mitford* v. *Mitford*, 9 *Ves.* 100; by Mr. *Butler*, in his note to *Co. Lit.* 351; by Mr. *Roper*, Mr. *Clancy*, and every respectable text writer without exception.    Sir Thomas Plumer considers the *dicta* in these cases as referring to the husband's power to assign his own personal right of reduction into possession, and not his wife's title; but they are apparently predicated without restriction of meaning, and contain nothing which would seem to give colour to that construction of them.    In *Grey* v. *Kentish*, Lord Hardwicke spoke expressly in reference to the husband's power to assign the wife's possibility as well as his own. It is true that Mr. *Clancy* considers an assignment of her possibility or reversionary interests as inoperative, and treats the two decisions of Sir Thomas Plumer as authority for that; but it will be seen that those interests and her choses presently reducible into possession, stand on the very same principle.    The American authorities are equally clear for the assignee.    The doctrine of *Bates* v. *Dandy*, is broadly asserted by Chancellor Kent, in *Schuyler* v. *Hoyle*, 5 *Johns. Ch.* 207; and in his *Commentaries*, vol. 2, 137, he says, the doctrine is understood to be a settled rule. I presume he means that it is so in this country, for he admits it to have been disturbed by the recent decisions in *England.* It is also asserted to be the rule by Chief Justice Savage in delivering the opinion of the Court of Errors in *Udall* v. *Kenney*, 5 *Cowan*, 597; and by Justice Washington, in *Krumbaar* v. *Burt*, 2 *W. C. C. R.* 406.    These cases, with *Hartman* v. *Dowdel*, 1 *Rawle*, 281, make up the sum of authority to be found in the American books.    Of the last it becomes me not to speak further than to say, that I discover nothing in it tending towards the impression received from it by Chancellor Kent, as expressed in a note to the page of his *Commentaries* already quoted, that the judge who delivered the opinion

(Siter and Another, Guardians of Jordan.)

of the court, entertained a doubt of the principle even of *Bates* v. *Dandy*. However the opinion of the court may have been expressed, it certainly was intended to rule the cause expressly on the distinction between a voluntary assignment and one for value. It will be seen, therefore, that Sir Thomas Plumer stood single and opposed to every other judge or writer who preceded him; and to run counter to such a current of authority for the sake of a theoretic principle, would seem to require the principle to be self-evident and its obligation to be irresistible.

But what is this principle? It is that the law, having declared the marriage to be a gift to the husband of the wife's choses in action, but on condition that he reduce them into possession during the coverture, is so uncompromising in exacting a performance of the condition, as to preclude him from exercising without it, not merely a power of his own over any supposed interest of his own, but the *wife's* power and dominion over her title, of which the marriage has made him the depositary and the instrument: and that though he has incontestibly succeeded to her power and dominion by the incorporation of her civil existence with his, and possesses them as the representative of her person, as amply and effectively as she possessed them, yet that he cannot exercise them to transfer her title, but only *his* own incidental and derivative power of reduction into possession, to be exercised by the transferree, as he himself might have exercised it, during the coverture. This is the entire foundation of the hypothesis; and if it give way, the hypothesis must give way along with it. Now whatever may be thought of the husband's succession to his wife's title before reduction into possession, his succession to her personal power and dominion will not be contested. Sir William Blackstone having said, " that the chattels which formerly belonged to the wife, are by act of law vested in the husband, with the same powers as the wife when sole had over them," proceeds to say, that " this depends entirely on the notion of a unity of person between the husband and the wife, it being held that they are one person in law, so that the very being and existence of the wife are suspended during the coverture, or entirely merged or incorporated with that of the husband." 2 *Com.* 433. If then, as it is said, he has the same power over her chattels that she formerly had, it is not a little singular that the law should have capriciously restricted the exercise of it to mere reduction of them into possession, when she herself might have transferred her title to them without such reduction. Such a restriction would be merely arbitrary, and destitute of that reason which is said to be the life of the law. It is true, the learned commentator adds, that he shall not *have* her choses in action, " unless he reduces them to possession *by exercising some act of* ownership *over them*." Is not a transfer of them, whether legal or equitable, an act of ownership? and do not the expressions of the commentator show, that he had in view a reduction into possession, not of the thing, but the title to it? This reduction, it seems, may be effected by the husband as the re-

(Siter and Another, Guardians of Jordan.)

presentative of his wife's power, not merely by the occupancy of the thing, but by any other act which asserts a new and distinct ownership, under what was formerly her title.   Public policy, founded in convenience, and the fluctuation of trade, requires that the dominion over chattels should not be in abeyance; yet it would always be so to some extent, and, in the case of a chose depending on a long credit, might be so for years, if the recovery of it were a condition precedent to the vesting of a disposing power over it.   To what end make possession of the thing an ingredient in the transfer of the title to it? That it is necessarily so in the transfer of a chose in action, which is a subject of legal assignment, will not be pretended.   Yet it seems to have escaped those who maintain the hypothesis, that to carry it out, would require the wife's survivorship to be sustained even against a legal assignee—a proposition that would not bear a moment's examination.   The husband's endorsement of her promissory note passes every vestige of her property in it, as does his assignment of her mortgage, though the mortgaged term be not in possession, or her interest in an elegit sued out on a judgment recovered by her when sole; because all these are assignable at law.   *Grute* v. *Locroft, Cro. Eliz.* 287.   *Carteret* v. *Paschal,* 3 *P. Wms.* 200.   And he might undoubtedly pass her interest in a bond, assignable by force of our act of assembly.   By that act, a bond expressly payable to assignees, may be assigned so as to give an action in the name of the assignee; but where it contains no such clause of payment, the action must be in the name of the obligee, as a trustee.   The difference as to the title of the assignee, has been hitherto considered as but formal; but it would be substantial, if a husband could part with, as own, his wife's interest in her bond, containing such a clause, and yet be able to part with no more than a naked power without it.   For the want of such a clause, the property might be tied up for twenty or more years, if the original credit had so long to run.   " When the husband assigns his wife's chose in action," asks Sir Thomas Plumer, " does the thing assigned continue to be a chose in action or does it become a personal chattel in possession?   If it does not continue after the transfer to be a chose in action, what makes it cease to be so?   A chose in action, cannot cease to be a chose in action, but by being reduced into possession."   No one doubts it, but what has that to do with the husband's power to transfer it as the representative of his wife's person?   If reduction to possession were at all necessary to the exercise of this power, his questions might be turned against him, with irresistible effect.   Is a chose in action, the less a chose in action, for having been legally, instead of equitably assigned?   And if reduction into possession, instead of the payment of a consideration, be indispensable in any case to give the assignee the property, why not in that? To escape from the dilemma presented by these inquiries, it is necessary to assert, what Sir Thomas seems to admit, that an assignment may, in certain circumstances, be a sort of reduction into the possession of the assignee.   If by that is meant a possession of the thing,

and not of the title to it, the assumption is a monstrous one; and to admit that a reduction into possession of the title, is all that the law requires, is to surrender the argument. But granting, for the sake of the argument, that a legal assignment of the title, is a constructive reduction to possession of the thing, it is not easy to comprehend how an assignment can be more so, when it transfers the legal, than when it transfers the equitable title; or why the wife's survivorship should be controlled by it in the one case, and not in the other. The truth is, that the notion of a possession of the thing, as a condition precedent to the vesting of the wife's dominion in the husband, as the representative of her person, is one of those things, that have passed current in the world, for want of attention to detect it. Marriage is in strictness not an immediate gift of the wife's chattels, whether in possession or in action, though it is so in effect, the suspension of her capacity to exercise a dominion over them, and the transfer of it to the husband, as the necessary consequence of the blending of their persons, putting it in his power to assume her title, or transfer it to any one else. Her civil existence enters into, and is consolidated with his, so that they form but one person; but it enters attended with all the individual powers and capacities, which before resided in her person separately, to be exercised thenceforth by him, through whom alone she can speak and act. That he succeeds to all her personal capacity, is proved by her marriage, when she happens to be an administratrix, which devolves on him the business of the administration, and enables him to act in it without respect to her assent or concurrence; and it is his succession to this capacity that enables him to exercise her personal right of election, under our intestate acts, and thus to divest her title, even to her land. But her title to her choses in action, continues to reside in her natural person, notwithstanding the transfer, to that of her husband, of the power necessary to exercise the dominion incident to it; and, on a dissolution of the union, follows her person, or goes to the representative of it, unless it has been divested by the husband, while the power to do so resided in him. Her term for years, in which the marriage gives him an anomalous interest along with her, is an exception to this, and the only one, that goes indifferently to either surviving, in analogy I presume to joint tenancy. But to divest her title to her chattels personal, any act it will be seen, is sufficient which evinces a present purpose to do so. As regards her chattels in possession, nothing further is necessary to make them his, than the possession itself, which, when unexplained by circumstances, is essentially an index of ownership; and of an ownership necessarily exclusive, as she is destitute of capacity to possess them or use them in any other character, than that of his agent or servant; consequently his use or possession of them, is to be taken as under the new title which his power may create. It will be seen, however, that even possession will not amount to an assertion of title, where it is not intended to have that effect. But it does not follow, because mere occupancy is sufficient to constitute a new title when so intended, that it can be constituted in no other way. Suc-

ceeding to the personal capacity of the wife, and becoming the organ of her power, he may dispose of the subject of it, as she herself might have disposed of it.   The inquiry, then, how the assignee of the husband can have any other or better title than the husband himself had, will be found to rest on no better foundation, than would an inquiry how the grantee of an attorney can have any other or better title than the attorney himself had.   The question is pointless, when it is considered that the husband is invested with, not merely a subordinate attribute of the wife's ownership—the power of reduction into possession—but with full dominion over the property; and that his assignment of it transfers, not this subordinate attribute, but whatever she has, by his instrumentality, capacity to part with.   That he has such dominion, is proved by his power over her choses in action susceptible of legal assignment.   A legal assignee may indeed sue on his own title while an equitable assignee cannot; an action at law being maintainable only on a legal title; and hence Sir THOMAS PLUMER, seems to consider as conclusive of the right, that a chose equitably assigned, can be reduced into possession, by an action only in the name of the wife.   To say nothing of what is manifest at a glance, that the objection, if available at any time, would be equally so in the lifetime of the husband, it is necessary but to remark, that the conclusion rests on the assumption of ground not to be conceded—that the beneficial interest is inseparable from the legal title.   That it is otherwise, is proved by the property which the representative of a deceased partner has in the joint effects, though an action to recover them lies only in the name of the survivor; and from this it may be conceived, that the wife's beneficial interest can pass, though the assignee have no remedy to recover it but an action in her name. It is the practice of every day to use the name of the original owner, with or without his consent, where the equitable has been severed from the legal title.   I am aware that reduction into possession, is generally, if not universally, said by text writers, to be a condition of the *husband's* ownership; and so perhaps it is, as there is scarce any other means of exercising his general power of disposal, so as to transfer the title to himself; at least such, in a countless majority of instances, is the means pursued.   Hence, by mistaking cause for effect, from frequency of recurrence in a particular way, the mind is led to contemplate possession, as the criterion of the right, instead of a means of acquiring it.   Instances however will presently be given, of its having been acquired by means short of possession.   But the fallacy consists in taking for granted that the title must be first vested in the husband, to enable him to convey it to another, without considering that an authority uncoupled with an interest, would equally enable him to do so.

There are other cases than those of legal assignment, which it is impossible to reconcile to the criterion of possession, or to each other, on a foundation so narrow.   I have said that the actual possession of the husband, does not bar the wife's title, where it is not intended to

have that effect.   In *Baker* v. *Hall,* 12 *Ves.* 497, her ownership was not displaced by his receipt as her trustee, because, as it was expressed, " the husband must be considered as having entered into possession as a trustee and executor of the will, and not as a husband; and therefore the wife's share of the residue, could not be deemed sufficiently reduced into possession, so as to prevent its surviving to her on his decease, and of course going upon her death to her representative."   Would it not have been better to say, that he did not sufficiently appear to have acted by virtue of the power in him, with a design to make himself master of her title.   That it is not the degree of possession, but the quality and object of it which is material to the question, is shown by *Wall* v. *Tomlinson,* 16 *Ves.* 413, in which it was said, " that the transfer of the wife's stock to the husband merely as trustee, could not be represented as a reduction into possession that would entitle his representatives.   *It was made* DIVERSO INTUITU."   On the same principle, is the decision in the matter of *Miller's Estate, Ashmead's Rep.* 323, and the cases in *Dessaussure's Reports.*   Thus, we see, it is not the taking of possession which, though usually an unequivocal act of ownership, may yet be qualified by circumstances, that gives a new direction to the title, but the assertion of a title distinct from, and independent of that of the wife, of which possession is but evidence.   Yet if the act of entering into possession were even the modal performance of a legal condition, it would be attended with all the legal consequences of essential performance in respect to the vesting of the title depending on it, without regard to the motive for the entry, whether it were to agree to his own title, or disagree to that of any one else.   It would seem, therefore, to be actual disposition, inconsistent with the wife's title, and not the abstract effect of possession of the thing, which is but a specific means of effecting such a disposition, that is the criterion.   If actual reduction into possession *as husband,* were the exclusive means of divesting the wife's title, a husband already in possession as a trustee, would be destitute of power to vest it in himself, or transfer it to another ; for I know of no act to be done as an equivalent.   I proceed to instance a few more cases that cannot be reconciled to the criterion of possession.

In an action to recover her chose acquired when sole, she must be joined.   But she may be joined or not, where the chose has come to her, since the marriage ; and when the husband sues alone, the judgment bars her survivorship, because the recovery stands on his title.   But even a joint recovery, though apparently on her original title, divests it, and creates a new title in its place, which survives to the one or the other of them on the principle of joint ownership.   *Oglander* v. *Batson,* 1 *Vern.* 396.   *Garforth* v. *Bradley,* 2 *Ves.* 676.   On the same principle is *Woodyer* v. *Gresham,* 1 *Salk.* 116, where the husband and wife had sued out a *scire facias* in their joint names on the wife's judgment recovered when sole, and had an award of execution, after which the wife died ; and it was held that her original title by the recovery of judgment, was supplanted by the joint award

(Siter and Another, Guardians of Jordan.)

of execution, which of course was held to survive to the husband. Yet there was no pretence of reduction into possession; for it was admitted that execution could issue but on the original judgment, the award of it on a *scire facias* not being there, as it is here, a judgment *quod recuperet.* And in this respect, a recovery in chancery follows in its consequences a recovery at law, an order of payment to the husband alone, or to the husband and wife jointly, having the same effect to create a new title and displace the old one. *Heygate* v. *Annesly*, 1 *Bro. C. C.* by *Eden*, 362. *Forbes* v. *Phipp*, 1 *Eden*, 503. But mere payment into court without such order will not have that effect, as appears by *Phipps* v. *Anglesea*, 1 *Fonb.* 89, and *M'Cauley* v. *Phillips*, 4 *Ves.* 15; nor will a decree barely declaring the money to be the property of the husband and the wife. *Nanney* v. *Martin*, 1 *Ch. Ca.* 27. *Carr* v. *Taylor*, 10 *Ves.* 578, and *Richards* v. *Chambers*, *Id.* 580. And the reason of the difference seems to be, that an order to pay, operates on the title like a judgment which concludes the right, while a decree but declares the right as existing by force of the original title. Now, in all the preceding cases, the judgment or order left the chose specifically outstanding, so that reduction of it into possession was not pretended; yet the title was changed and undoubtedly by force of the husband's control of it through the medium of the courts; they consequently evince in him, the existence of a disposing power over the wife's chattels while they are yet in action. That he is the recipient of her power and capacity to act in the disposal of them, is proved by the fact itself, that he has power to reduce them into possession; for if he may exercise an ownership by that means, why may he not by any other which indicates an intent to give effect to his power, or why should the law be supposed to have restrained the exercise of it to one arbitrary mode of action? But the existence of a general power of disposal, independent of property in himself, is conclusively proved by his undoubted power to release the title to her chattels before they are actually reducible into possession, and consequently before he could gain a property in them; which, implying as it does, the highest grade of dominion, could spring from no other source. But that he has a power to dispose of her chattels independent of a beneficial interest in them of his own, is proved by his power over assets of which she is but the executrix, in which he has no such interest even when in his possession.

If, then, he succeeds to the power of disposal that was in her, why may not his sale of her property in action, be as effectual to pass the beneficial interest in it, as if it were made by herself when sole? Where the legal title has passed, we have seen that objection by her is waived or disregarded; and where the contract requires the assistance of a chancellor, it is difficult to imagine an equity on her part to defeat the acts of her representative, in the benefit of which she and her children have participated. It never has been pretended that her survivorship depends on a specific equity, or that it is any thing but a legal title. It is agreed that equity will execute, if for

(Siter and Another, Guardians of Jordan.)

value, an assignment of a legal chose in action against the husband himself; and if the wife has no specific equity to countervail the equity of the assignee and by that means give a preponderance to the legal title, there is no reason why the contract should not be executed against her also. An execution of it against the husband is necessarily, an execution of it against the wife, because when executed, it has the effect of a legal assignment. Why, then, should there be a difference in substance in the first instance? I am unable to see why he may part with her property by the one sort of contract, and not by the other, as she herself might have done. The fallacy of the doctine seems to consist in a notion that the husband's power extends no further than to the performance, but not in a representative capacity, of certain specific acts in relation to it; and this notion is rested, among other things, on the restricted operation of assignments in bankruptcy and insolvency, which however will be found to rest upon the peculiar principles of an arbitrary system.

The spirit of the bankrupt laws is policy not justice. The object being to encourage trade by procuring payment of mercantile debts out of any fund within the bankrupt's control, without regard to the interests of others; those laws are deaf to the claim of his family in respect to interests, which he has even a naked power to control. Thus the 1 *Jac.* 1, declares that the assignment, "shall bind issue in tail, and all others whom the bankrupt may by a common recovery cut off;" and by the 3 *G.* 4, made perpetual by the statute called the New Act, it is provided, that the assignment shall be equivalent to the execution of a general power of appointment to uses, in order to give the estate to the creditors; and the same spirit dictated the effect originally attributed to it by the courts, in relation to the wife's choses in action. Notwithstanding the assignment is not the act of the husband, but of third persons—of the commissioners in cases of bankruptcy, and of the clerk of the peace in cases of insolvency, or, in both cases, more properly of the law which imparts to it, and regulates its effect—it was held to be *ipso factó* a divesture of the wife's title, as if it were the husband's own act, and a spontaneous exercise of his power. On abstract principles it might have seemed that though the power is a valuable one, yet that the exercise of it pertains, by its nature and origin, to his individual volition, and not to the volition of his creditors or their representatives, who have no moral, or expressly legal right, to require him to despoil his wife for their benefit. These have no other equity by the bankruptcy, than they had before it; and certainly none against the wife, on the credit of whose outstanding property, the debt was not contracted. The palpable injustice of these decisions, induced Sir WILLIAM GRANT, in *Mitford* v. *Mitford,* to depart from them to a certain extent, not however by taking his stand upon principle and entirely protecting the title of the wife, as it seems to me he ought to have done, but by taking a middle course and allowing the assignment to pass the incidental right of reduction into possession as the husband had it, and subject

(Siter and Another, Guardians of Jordan.)

to the same limitation, as to time, in the exercise of it. The adoption of this principle, which gives the wife's title a chance of preservation, is certainly in mitigation of the earlier decisions; but it will probably be found of little value in practice, as creditors are usually sufficiently prompt, to seize upon all that can be brought within their reach. What is more to the purpose, is, that the decree was founded on no analogy drawn from the effect of a spontaneous assignment by the husband; for Sir WILLIAM GRANT, expressly distinguished between an assignment by operation of law, which puts the assignees exactly in the place of the bankrupt, and a particular assignment for a specific consideration which was admitted by him to pass the wife's choses in action so as to bar her survivorship. The foundation of the difference cannot be that the assignment of the law transfers but an incipient title; for viewing the bankrupt as the owner of an interest and not as the instrument of his wife's power, his own assignment could transfer no more. But there cannot be even an inceptive title in him consistently with the existence of a title in the wife; and what does she ever take by survivorship? Not a new title acquired by the event, but the old title which all along resided in her; the capacity to use it, and not the title itself, being regained by the dissolution of the union. If, then, he had a title, he would have it concurrently with the wife; and the property would survive indifferently to either, on the principle of joint tenancy. Yet he is entitled but as her administrator and can recover her choses in action in no other character. Neither is the difference to be attributed to the want of a valuable consideration; for the effect of the certificate in releasing his person and future earnings, would afford a decisive answer to that. It is evident, therefore, that the learned and able master of the rolls founded his judgment, not on the abstract nature of the husband's interest or power, but on the general scope and tendency of the bankrupt laws, tempered by an infusion of humanity and justice. In our own state, the assignment of an insolvent debtor, being his own deliberate act for the recovery of his liberty, and therefore for a valuable consideration, is treated as, what it is in fact, a spontaneous transfer of every interest which he had power to part with. On this principle is *Rechwine* v. *Heim*, 1 *Penn. Rep.* 373, which may therefore be added to the list of authorities already given.

A distinction has been attempted between choses presently reducible, and possibilities or reversionary interests. Indeed *Purdon* v. *Jackson*, seems to be founded on it, and it is expressly taken in *Honner* v. *Morton*; yet it is ingenuously admitted by Mr. *Clancy* who adopts it, that the arguments to sustain the assignment as to the one class, are equally operative to sustain it as to the other. In fact no attempt has been made by any one to found it on principle; nor could there be, for the elementary principle relied on in *Purdon* v. *Jackson*, or the one brought into view in the present case, would alike dispose of it as to both. If it be conceded, as it seems to me it

must, that the husband may release his wife's possibility if it be capable of taking effect during the coverture, it will follow that his assignment of it would equally divest her title. A power to release, implying, as it does, the highest grade of dominion, can spring from no other source than a general right of disposal. It is in this respect analogous to a general power of appointment to uses, which is equivalent to a limitation in fee, because it enables the donee of the power to give the estate as he pleases. It would be strange, then, if a source which maintains a power to release, were insufficient to maintain a power to assign even a possibility, which has been an admitted subject of release ever since the determination of *Theobalds* v. *Duffoy*, 9 *Mod.* 102; and if the wife might have released her possibility, it were equally strange if the husband could not release it for her. But here again we are met with an assertion that whatever has been said of the husband's power to release, is to be understood, not of the wife's title, but of his own contingent interest in it. Whatever is found in the books, however, is clearly predicated of his power over *her* possibility and of his capacity to bar her title. In the *Anonymous Case* in 2 *Roll.* 134, it is indeed said that the husband has an interest which he may release; but it is evidently an interest in right of his wife, which he may release in right of his wife. The expression of Lord HOLT in *Gage* v. *Acton*, relates expressly to the title of the wife. "Where," said he, "the wife hath any right or duty which by possibility may happen to accrue during the coverture, the husband may by release discharge it; but where the wife hath a right or duty which by no possibility can accrue to her during the coverture, the husband cannot release it." 1 *Salk.* 327. It is said by Lord LYNDHURST in *Honner* v. *Morton*, that *Lampet's Case*, 10 *Co.* 46, cited by Lord HOLT for this, "does not support the position in the unqualified way in which he states it." I am unable to see wherefore. The husband released so as to bar his wife's survivorship, her contingent or reversionary interest in a term for years dependent on a precedent interest for life; which seems to come entirely up to the point. But it is said in a note to *Purdon* v. *Jackson*, that *Lampet's Case* lends no support to the position of Lord HOLT, because the decision proceeded expressly on the ground that "such possibility of the wife might be *extinguished* by grant or release to him in possession," but that "such future or executory interest could not be *granted* to a stranger during the life of the first devisee." In a court of law which recognizes no title but a legal one, it would have been strange had it been held otherwise; and the same remark is applicable to the passage from *Shepherd's Touchstone.* But *Lampet's Case* in fact does support Lord HOLT's assertion to the very letter; for he spoke not of the husband's power to grant, but to extinguish. He is also fully sustained by Mr. *Butler. Co. Lit.* 351, *a.* note 304. It is true Lord HOLT was in a minority as regards the point of the cause; but the distinction taken by him is in striking coincidence with the position of the majority, that the intermarriage of an obligor with the obligee suspends, but does not extinguish, a

(Siter and Another, Guardians of Jordan.)

bond payable after the expiration of the coverture. Why does it not? Evidently because there is no greater union of person and consequent absorption of the wife's existence in regard to such a bond, than there is in regard to a contingency, or possibility that cannot happen or take effect during the coverture; and the wonder therefore is that the principle of Lord HOLT did not conduct him to the conclusion reached by his brethren. But as regards all beside, this union, which vests in him all the personal capacities and powers of the wife, gives him the capacity and power to do whatever she could do were she sole. And this principle not only reconciles the cases to each other, but relieves us from the awkwardness of explaining them on principles essentially different, by sometimes adopting the notion of a fictitious reduction into possession, and sometimes rejecting even the circumstance of actual possession. If the husband is taken to be the depositary of his wife's power, but not of her title, except when incidently acquired by an exercise of that power, there will be no discrepance of principle or decision whether as to choses presently reducible, reversionary interests, or bare possibilities: for the question in respect to each of them, will be brought to this: does a contract of assignment for valuable consideration, entered into by a *feme* through the agency of her legal representative, bind her in a court of equity? I am of opinion that it does, and that the distinction attempted between vested and contingent interests, has no place in our law.

Independent of this, there is an ingredient in this case which seems to oppose an insuperable barrier to the title of the second husband. Had actual payment been made to the first, the validity of his assignment could not have been contested; and if the trustees, standing in his place, are to be treated as possessed under the trust, there is an end of the question. On what ground is their possession, as trustees, to be disputed? To have handed the money across the table as guardians, in order to receive it back as trustees, would have been a useless and an idle ceremony. Where the same hand is to pay and to receive, the transfer is made by operation of law; as where an obligee makes the obligor his executor, the debt is presently assets because, though the action is gone, the making of him executor amounts not to a legacy, but payment and a release. *Needham's Case*, 8 *Co.* 136. *Wankford* v. *Wankford*, 1 *Salk.* 306. So in the *Trustees of Jacobs* v. *The Executors of Jacobs*, not yet reported, it was held that executors who were also trustees of a legacy, possessed it in the latter character; and in *Fryer* v. *Gildridge, Hob.* 10, where the obligor had made the executrix of the obligee his executrix, the debt was held to be presently paid by way of retainer, so that no new action could be had for it, because a personal right of action once suspended is gone forever. To the same effect is *Griffith* v. *Chew*, 8 *Serg. & Rawle*, 17, and *Thomas* v. *Thompson*, 2 *Johns.* 473. Were it necessary to resort to it, this last principle would be decisive; for it will not be pretended that the first husband could

(Siter and Another, Guardians of Jordan.)

have maintained an action against the terms of his own deed, and it is plain the wife could not have sued separately by reason of the disability incident to her coverture.    Had this deed been executed by the trustees, we should have had an ordinary case of extinguishment by the substitution of one security for another, on the latter of which a suit might have been maintained at law, just as it might be maintained on a bond for performance of the trust.    But though there is no covenant for such performance, it is sufficient to give a remedy in equity that a trust has been declared.    It is conceded that the trustees assented to the assignment; but that is not material inasmuch as equity never suffers a trust to fail for want of a trustee, it being said, 1 *Mad. Ch.* 458, that where the trustees decline to act, the trust devolves on the court.    On every ground, therefore, I am of opinion the settlement is a valid one, and that the decree be affirmed.

Decree affirmed.