## Price's Appeal.    Jordan's Appeal.

1. Equity, in proceedings to rescind contracts, refuses relief to stale demands, and requires conscience, good faith and reasonable diligence in the complainant.

2. After a great delay the party is held to have waived his right to relief.

3. A party entitled to an estate expectant on the death of another, being *sui juris*, assigned his expectancy.   He could have sued for the rescission of the deed at any time after he made it, notwithstanding his right of enjoyment was suspended.

4. The grantee died twenty-one years after the assignment; the existing life estate did not excuse the delay in impeaching the deed; good faith required him to do it whilst his assignee was alive to defend it.

5. The evidence being such as would have justified a jury in finding that the assignment was in trust, and an auditor and the court below having so found, the Supreme Court would not reverse the finding.

6. All primâ facie presumptions are in favor of such a finding, and he who alleges error must prove it.

7. The assignment being a trust there could be no laches, for the time for the execution of it could not arrive until the death of the life tenant.

8. The decree of the court below charging the assignee with costs, approved under the circumstances.

March 6th 1867.    Before WOODWARD, C. J., THOMPSON, STRONG and AGNEW, JJ.   READ, J., sick.

Appeal by J. S. Price, administrator, &c., of Hiram Taylor, deceased, from the decree of the Court of Common Pleas of *Chester county*, distributing the estate of John M. Jordan.

Adam Siter, of Chester county, died in 1799, intestate, leaving, amongst other children, a daughter Ann, of whom Edward Siter and Devault Beaver were appointed guardians in 1803. She afterwards married John M. Jordan.    Of this marriage one child, Andrew Mitchell Jordan, was born on the 3d of August 1817.    On the 23d of October 1817 John M. Jordan alone executed the following instrument:—

"Know all men by these presents, that I, John M. Jordan, late of Blockley township, Philadelphia county, and state of Pennsylvania, do hereby acknowledge to have received of Edward Siter, of Radnor township, Delaware county, and Devault Beaver, of Tredyffrin township, Chester county, both of the state aforesaid, guardians duly appointed for the minor children of Adam Siter, deceased, the sum of three thousand two hundred and seventy-one dollars and ninety-two cents; in consideration whereof, and for the love and regard which I have and bear toward my wife Ann and child Mitchell Jordan, together with other good causes me thereunto moving, do hereby and by these presents assign, transfer, set over, convey and dispose of all my right, title, claim and demand whatsoever, of, in and to the residue of my share, which I claim through my wife, out of the

estate of my late father-in-law, Adam Siter, deceased, together also with my mother-in-law's dower after her decease (excepting and reserving only as is hereinafter reserved and excepted), unto Edward Siter and Devault Beaver, hereinbefore mentioned, in trust and for the uses and purposes as followeth, that is to say : the aforesaid Edward Siter and Devault Beaver, for the trust and confidence placed in them, do hereby bind themselves, their heirs, executors and administrators, to pay the interest annually arising from the residue of the aforesaid share and dower, unto my wife Ann Jordan, for her use and support, as also for bringing up and supporting our son Mitchell, for and during the natural life of the said Ann, and after her decease, to our said son Mitchell, if he should be of age at the decease of the mother, or as soon as he arrives to the age of twenty-one years, the principal ; and for the better securing the residue of the aforesaid share, for the uses and purposes hereinbefore mentioned, I do hereby, for myself, my executors and administrators, assign, transfer, convey and dispose of the same unto the aforesaid Edward Siter and Devault Beaver, their heirs, executors and administrators, in trust and for the uses and purposes hereinbefore mentioned."

After the execution of this deed, John M. Jordan, who was an intemperate man, and had squandered a portion of his wife's estate, deserted her, and was not again heard of. Upon his death she married Hiram Taylor, about 1825.

After his marriage, Taylor questioned the validity of the deed, and endeavored to recover the trust-money, on the ground that the estate of his wife consisted, when the deed was made, of choses in action, and had not been reduced into possession by her former husband.

The question was, whether the deed of trust passed the interest of the wife, and entitled the trustees to retain it for the purposes of the trust. The Supreme Court, in the case of Siter and Another, Guardians of Jordan, 4 Rawle 468, decided that the deed passed the estate to the trustees upon the trusts declared in it.

Andrew M. Jordan, the son of Mrs. Taylor, resided with her and her husband in Chester county, until 1835, when they removed to Maryland. In the summer of 1838 A. M. Jordan was studying medicine in Montgomery county, Penna., and in the winter of 1838–39, and part of the next winter, he was in Philadelphia, for the purpose of attending medical lectures. In the winter of 1838–39 he had fallen into habits of intemperance, being then nearly twenty-one years of age. His guardian, Edward Siter, furnished him money for his necessary expenses. His conduct during that time was very bad,—disturbing the peace of the neighborhood with riotous companions at night ; intoxicated almost all the

time, and entirely reckless in the expenditure of money. The importunate remonstrances of his guardian and other friends were in vain. He endeavored to induce his guardian to purchase his reversionary interest in the trust estate, and failing there, was making efforts to sell it to others.

Mr. Siter, learning that he was making arrangements for the sale of his expectancy, on the 3d of January 1839 wrote to Mrs. Taylor, Jordan's mother, who was his sister, informing her of his course since he had gone to Philadelphia, of his request that he, Mr. Siter, would buy his right under the deed of trust, and in conclusion saying: " This day I received information that he had applied to an attorney to see if he could not devise some way whereby he could dispose of his right. I called on him and informed him of the contents of the deed of trust, and I find that he has those bad characters with him who are endeavoring to have it arranged and buy it for a mere song. Therefore I presume he will dispose of his right, and if it is to be sacrificed I think that you and Hiram had better have it than any person else, and I would recommend that you would lose no time in the matter, but come as soon as possible, prepared to do something in the case. Those persons, who he does associate with, will take every advantage of him, and the money that they ought to give him they would take from him again. I did not think he would have so far forgotten himself as to go to sell his right for a mere song. He informed me that he had been down to see you. I would say much more, but the paper is now full, and must conclude by earnestly requesting your immediate attention to the subject, and I will retard as much as possible him disposing of his right."

On the night of the 11th of January, Jordan was engaged in a brawl in the streets of Philadelphia, was arrested by the police, taken to prison and detained till next morning, when he was brought before the mayor, fined and discharged.

He was taken by Taylor, immediately after his discharge, to West Chester, and Taylor went to his own counsel in regard to the transferring of Jordan's interest in the trust fund to him. Mrs. Taylor was not at that time in West Chester ; and on that day, January 12th 1839, Jordan, in consideration of $300, the receipt of which was acknowledged in the deed, "and divers other causes and considerations him thereunto moving," transferred to Taylor his whole interest in the trust fund, then about $5600.

The counsel testified that Mr. Taylor stated to him that Jordan had been guilty of excesses in drink, that his mother was anxious about him, and supposed that if he got this money it would not be of any service to him, and that she was anxious to have the matter arranged.

He testified further that this statement was not made in the

presence of Jordan; that the two men called at his office, and that he received the instructions for the deed from the mouth of Mr. Taylor; that it was read to the parties, and signed in his presence, and acknowledged before Justice Fleming; that he had no recollection of anything the young man said or whether he said anything; that his mood seemed to be that of a taciturn man; that he (the witness), saw nothing to render him suspicious that Jordan was not competent to execute the paper.

Jordan was, at this time, between twenty-one and twenty-two years old. After the execution of the deed he was taken by Mr. Taylor to his residence in Maryland. Taylor two days after the execution of the assignment gave notice of it to Mr. Siter, one of the trustees.

Jordan again attended medical lectures in Philadelphia one season; lived for two or three years with his stepfather and worked on his farm. His life up until 1855 was variable, engaged in many different employments; sometimes drinking to excess; after 1855 he had been steady.

A daughter of Taylor testified that whilst Jordan was living with her father in Maryland she " always understood him as perfectly satisfied with the deed; he always said that it had been made with his full knowledge and consent, and was just what he meant to do."

Taylor died in Baltimore in 1859, leaving his wife, Jordan's mother, to survive him, having bequeathed this fund to the grandchildren of himself and Jordan's mother.

After his death the assignment, which had remained in his possession since its execution, was recorded.

The executor of Edward Siter, the surviving trustee, settled the trust account December 11th 1860, showing the balance of the trust fund to be $5576.83. On the same day the executor of Taylor and his widow petitioned the court to order the payment of the fund to them on their joint receipt.

The account and petition were referred to John H. Brinton, Esq., as auditor. Jordan appeared before the auditor and, alleging the invalidity of his deed under the circumstances, claimed the whole fund by virtue of the original deed of trust. The question whether the assignment to Taylor created a trust for Jordan, was not raised before Mr. Brinton.

He reported that Jordan would have been relieved from his contract if he had applied shortly after its execution, but by the delay the deed is now binding on him, and that the fund should be paid to Taylor's executor on the joint receipt of the executor and Mrs. Taylor.

The court, January 17th 1862, reversed the report and dismissed the petition, " but without prejudice to the rights of the petitioners or heirs at law or devisors of Hiram Taylor in any

suit hereafter to be instituted, &c., relative to the subject-matter."

. Mrs. Taylor, the widow, died about December 1862, and J. T. Price, Esq., took out administration of Hiram Taylor's estate in Pennsylvania. On petition of Jordan, J. Smith Futhey, Esq., was appointed auditor to distribute the fund amongst the parties entitled thereto. ·

The facts above stated were found by Mr. Futhey, and he also reported: "The courts in Maryland have always had authority to set aside deeds for fraud, accident or mistake in matters of fact, precisely as the same object could be attained in England; and probably, upon proper application and proof, might have made a decree, ordering the. deed in this case to be delivered up by Mr. Taylor and cancelled;" but that he did not think that, under the circumstances disclosed by the evidence, the failure of Dr. Jordan to apply to the courts in Maryland for such a decree, prevented him from now seeking to avoid the deed in Pennsylvania.

He further reported: "But the more reasonable view to be taken of the transaction is, that Mr. Taylor, regarding his duty as one standing in the relation of a parent, hastened to Philadelphia on learning the condition of affairs, and procured the assignment to be made, with the view of securing it for his step-son, so that he should not be defrauded. In this view he would occupy the relation of trustee, and would not be entitled to more of the fund than would reimburse him."

He accordingly awarded, out of the fund to the administrator of Taylor, $300, the consideration mentioned in the assignment, with $100 additional for expenses incurred by him in relation to it, with interest on these sums from the date of the assignment, the whole amounting to $1060.66; and, after deducting the costs of the audits, reported that the balance, $5316.42, should be paid to Andrew M. Jordan.

Jordan excepted to the report for allowing Taylor's estate credit for the above sum of $1060.66.

The administrator of Taylor excepted to the report for not awarding to him the whole fund, and also because upon the principle adopted by the auditor, he should have reported "an additional sum to his administrator sufficient to remunerate Hiram Taylor for the support and maintenance of Andrew Mitchell Jordan for two or three years from January 1839, during which time he resided with Mr. Taylor, and amounting, with interest, to at least the sum of $1000."

The court (Hon. J. J. Pearson, president of the Twelfth District, presiding, and delivering the opinion), after referring to the question whether the assignment was intended to be an *absolute* conveyance to Taylor, said:—

"We are disposed to put a construction on the whole transac-

[Price's Appeal.]

tion less at variance with common honesty, and more consistent with the duty of those taking the assignment. If the object of Taylor in obtaining the deed of 1839 from Jordan, was to hold it for *his benefit*, and prevent the fund from going into the hands of strangers, it is consistent with the duty of one who has placed himself *in loco parentis*, and we should always construe the con duct of every one to be honest and fair, rather than the reverse, if the act will by any possibility bear such construction. As we conceive, Taylor took this deed to keep the property for Jordan, and never evinced any other intention until he made his will on the 28th day of February 1859, devising the reversionary inte- rest to his own children, and not until the will was made public by probate would Jordan have any notice, actual or constructive, that Taylor intended to defraud him out of his patrimony, and retain his property after his mother's death. Until then Jordan had no right to institute proceedings to collect the money, and had no reason for applying to a court of law or equity to rescind a deed which was doing him no injury, and which he had a right to expect, would never be brought up in judgment against him. This in our opinion sufficiently accounts for the delay.

"Had Mr. Taylor made known to Dr. Jordan his intention to hold the reversionary interest transferred by the deed, and the latter had not proceeded within twenty years thereafter to have the deed cancelled and the contract rescinded by a decree in equity, we would have held him perpetually barred. Within less than a year after the date of the will, when Mrs. Taylor and her deceased husband's executor applied to this court to have a decree made in their favor to take the money which was in the hands of the trustee, we find their action opposed by Dr. Jordan, who im- mediately brought forward his proofs to show the circumstances under which the deed was obtained. He acted promptly after notice that Taylor claimed the money as his own. * * *

After further arguing the question as to a deed from a child just arrived at age to a parent, and citing authorities, he says :—

"We have therefore no hesitation in declaring this transfer of a vested interest of over $6000, although only to take effect in possession on the falling in of one life in being, for the paltry sum of $300, no part of which is proved to have been paid, a most inadequate consideration ; especially as it can be looked upon in no other light than ' *catching a bargain*' from one in expectancy, and that too by a step-son of the assignee, barely of age, and the deed executed at the end of a long drunken frolic, and before recovery from the disgrace of being confined in a city prison on account of intoxication.

"The only difficulty arises from the great lapse of time, and that can have little bearing if our views are right as to what Mr. Jordan had a right to believe was his step-father's pur-

pose in taking the deed—to hold the property for his future benefit." * * *

On the subject of costs he said :—

"If an executor, administrator, guardian or trustee should settle an account which, after a full hearing, should be found to be unjust or illegal, and the accountant should be greatly surcharged by the auditor, it would be an outrage to throw the expenses of the whole examination on the fund, which would be a deduction of just so much from the money of the heir or creditors. The person found to be in the wrong must, in almost every case, bear the expense of the investigation, except when it appears that the party acted in good faith, and committed an honest error to a small amount.

"The court will therefore, in its decree, make the correction indicated, as to the costs, and in every other particular the report of the auditor will be confirmed."

Both parties appealed.

The administrator assigned for error :—

1. Not awarding the whole fund to him.

2. Not allowing him remuneration for the maintenance of Jordan for the time he resided with him.

3. Imposing the costs on Taylor's estate.

Jordan assigned for error, that the court allowed Taylor's estate $300, the consideration mentioned in the assignment, and $100 expenses in relation to it, with interest.

*W. Darlington* and *E. K. Price*, for Taylor's administrator. —The case is *free from fraud*, and is one of inadequate consideration merely. It is to be treated precisely as if the appellee had presented his bill to have the deed delivered up and cancelled, on the ground of inadequate consideration.

Courts of equity were always open in Maryland, with full power over the case and the persons; the appellee was always *sui juris*. He who invokes the aid of a court of equity, must present a case of pure equity, and prosecute it with reasonable diligence: 1 Story's Eq. 237. Even if he could do so were the transaction recent, after this lapse of time, he is barred. The time, settled by repeated adjudications, in which such claims. will be barred, is twenty years: Smith *v.* Clay, 3 Br. Ch. R. 639, note ; Price *v.* Byrn, cited in Campbell *v.* Walker, 5 Ves. 681 ; Gregory *v.* Gregory, Coop. 201, cited in 4 Hare 264. This decision was affirmed upon appeal: Jac. 631 ; Moth *v.* Atwood, 5 Ves. 845 ; Hovenden *v.* Lord Annesley, 2 Sch. & Lef. 636 ; Cholmondely *v.* Clinton, 2 Jac. & Walker 141 ; Champion *v.* Rigby, 1 Russ. & Mylne 539 ; Roberts *v.* Tunstall, 4 Hare 257 ; Elmendorf *v.* Taylor, 10 Wheat. 152 ; McKnight *v.* Taylor, 1 How. 161 ; Bowman *v.* Wathen, 1 Id. 189 ; Provost *v.* Gratz, 6 Wheat. 481 ;

[Price's Appeal.]

Wagner v. Baird, 7 How. 234; Sullivan v. Sullivan, 2 Monthly Law Reporter, January 1859; Jenkins v. Pye, 12 Peters 241; Cope v. Humphreys, 14 S. & R. 15; Deimer v. Sechrist, 1 Pa. R. 419; Foulk v. Brown, 2 Watts 209; Ankeny v. Penrose, 6 Harris 190; Strimpfler v. Roberts, 6 Id. 283, 289, &c.; Hassler v. Bitting, 4 Wright 68; Act of 22d April 1856, § 6, Purd. 654, pl. 13, Pamph. L. 532; Bull v. Towson, 4 W. & S. 569; Garwood v. Dennis, 4 Binn. 314; James v. Letzler, 8 W. & S. 192.

The presumption is, that the deed of assignment spoke the truth, being unquestioned for a quarter of a century nearly, and until the executors waked up A. M. Jordan, is to be taken to have been truthful in every particular.

Courts of equity are more reluctant to interfere with an arrangement, such as appears in this case, than if the transaction were between strangers: Bellamy v. Sabine, 2 Phila. R. 439.

In regard to the cases relied on by the auditor and the court below: In Crow v. Ballard, 2 Cox 253, there was positive fraud; in Peacock v. Evans, 16 Ves. 572, no question of the effect of lapse of time or confirmation arose.

Sir William Grant, M. R., ruled in Gowland v. DeFaria, 17 Ves. 20, upon the presumed continuance of the same distress which pressed the plaintiff to enter into the contract, and that only when he is relieved from that distress can he be expected to resist its performance: Woods v. Downes, 18 Ves. 120, and Edwards v. Meyrick, 2 Hare 60.

The mere poverty or insolvency of a debtor will not rebut the presumption of payment of a specialty arising from lapse of time: Kline v. Kline, 8 Harris 503.

*W. MacVeagh* and *P. Frazer Smith* (with whom was *G. F. Smith*), for A. M. Jordan.—The condition of Jordan and the circumstances under which the contract was made, were such as made the transaction of a most suspicious character. Jordan had just attained age, weakened in body and mind by his continued excesses, was necessitous, and desirous to obtain more from his expectancy; was hurried to a distant place to execute a contract conveying for $300 an estate of $5600 to his step-father, who came from Baltimore in great haste to obtain it; the paper being drawn under instructions from Taylor by Taylor's own attorney, with no opportunity for Jordan to consult any one.

This case comes under the class whom the law protects, to wit: improvident men who have expectancies, especially the young, rash and dissolute, who are disposed to sacrifice the future to the present: 1 Stor. Eq. § 335-37; Chesterfield v. Jaansen, 1 Atk. 413; Gwynne v. Heaton, 1 Br. Ch. R. 11; Boynton v. Hubbard, 7 Mass. R. 120; 1 Stor. Eq. J. § 339. The party to whom Jor-

dan had the right to look for protection was bargaining with him and was the one against whom he needed protection.   Taylor's relation to Jordan was a reason why the courts would look with more jealousy on the transaction than if dealing with a stranger : Taylor *v.* Taylor, 8 How. 200–1 ; Hoghton *v.* Hoghton, 11 Eng. Law & Eq. 134 ; Gowland *v.* DeFaria, 17 Ves. 26 ; Evans *v.* Peacock, 16 Ves. 514.

But was not the assignment at the time it was made in trust ? Is it presumable that the mother and her husband would deliberately despoil her son of all he had, or is it not the presumption that it was a purpose and effort to carry out the benevolent wishes of Mr. Siter to save him from others ?   Can any presumption of Taylor's fair dealing be made except by treating this as a trust ?

This theory is strengthened by the testimony of Miss Taylor, that long afterwards Jordan said he was perfectly satisfied—that it was with his full knowledge and was what he meant to do.

If therefore the assignment was in trust, there can be no laches in his not moving until Taylor by his will, and his executor by his petition, asserted an absolute right in Taylor.

But in any view are there any laches ?

During the whole time from 1839 to the death of Taylor, nothing was done by the assignee to indicate an intent to hold adversely.   If the assignment was absolute, he could at any time up to 1848, have claimed the whole fund for he owned the reversion and his wife the income : Torbert *v.* Twining, 1 Yeates 432 ; Siter's Appeal, 4 Rawle 483 ; Hamersly *v.* Smith, 4 Wh. 126.

The computation of time to bar a claim commences from the time the title accrues or the party is aggrieved : Smith *v.* Clay, 3 Br. Ch. R. 639, note.

As to the cases cited by the administrator's counsel : The sale in Price *v.* Byrn might have been impeached as soon as it was made.   In Moth *v.* Atwood the death of the tenant for life, when the right accrued, occurred shortly after the sale : Hovendon *v.* Lord Armesly ; Cholmondely *v.* Clinton ; Champin *v.* Rigby ; Elmendorf *v.* Taylor ; McKnight *v.* Taylor ; Wagner *v.* Baird, all speak of the computation being made from the accruing of the right of action.   Jackson *v.* Pye was decided on the ground that an adequate price was paid, the estate being dilapidated and requiring great expense for repairs ; the absence of any evidence of distress, imbecility or undue influence.   The lapse of time was thrown in by the court as adding weight to the other considerations.   In Gregory *v.* Gregory the sale was made by the reversioners when of full age, to the tenant for life, and their trustee. In Roberts *v.* Tunstall the tenant for life who was the purchaser, died about $2\frac{1}{2}$ years after the purchase, and $1\frac{4}{2}$ years after her

death the bill was filed. The Vice-Chancellor says that it might have been proper to leave out of consideration the whole time of the life tenant's life, if proceedings had been taken immediately after her death.

The allowance for the expressed consideration and expenses should not have been made. If a *trust* was designed it cannot be supposed that any consideration would be paid, and therefore the insertion of a sum was merely formal. Besides, the receipt in the deed is evidence of the lowest order: Hamilton *v.* McGinnis's Executors, 3 S. & R. 356 ; Jordan *v.* Cooper, Id. 389.

The opinion of the court was delivered, May 14th 1867, by

WOODWARD, C. J.—John M. Jordan, by a deed dated 23d October 1817, assigned and transferred all his interest in his wife's estate to Siter & Beaver, in trust, to pay the annual proceeds thereof to her for life, and after her decease to pay the principal to their only son, Mitchell Jordan, afterwards called Andrew Mitchell Jordan.

After John M. Jordan's death, his wife Ann married Hiram Taylor about the year 1825, and continued to reside in Chester county until 1835, when they removed to Cecil county, Maryland, and finally to Baltimore, where Taylor died in 1859—his wife in 1862.

Andrew Mitchell Jordan was born August 3d 1817, and resided with his mother and step-father till they removed to Maryland. He stayed in Pennsylvania to study medicine, and in 1838–39 undertook to attend lectures in Philadelphia, but had fallen into grossly intemperate habits, had wasted the moneys furnished him by his uncle, Edward Siter, who was his guardian, and was endeavoring to sell his expectant interest in the trust-fund created by the above deed of his father. On the 3d January 1839, Mr. Edward Siter wrote a letter to his sister, Mrs. Taylor, which brought her husband to Philadelphia to look after the boy, and he was found in the lock-up at the end of a gross debauch. Taylor took him to West Chester, and there in Mr. Lewis's office, on the 12th January 1839, in consideration of $300 and other good causes, Jordan sold and transferred to Hiram Taylor his whole interest and expectancy in the trust-fund to accrue to him at the death of his mother, under the deed above referred to. He then went home with his step-father to Maryland, and after residing some time in his family, married and settled in Maryland, where he still continues to reside. Taylor, by his will made in 1859, devised this fund to the grandchildren of himself and wife, but after the death of his wife, in 1862, an auditor was appointed on the application of Andrew M. Jordan to make distribution of the trust fund, he claiming it notwithstanding his deed of 1839 to

4 P. F. SMITH—31

Taylor, and the Pennsylvania administrator, the Maryland executor and legatees of Taylor claiming it under and by virtue of that deed.

The validity of that deed thus became the sole point of litigation. Jordan's claim to the fund was regarded by the representatives of Taylor as substantially a bill in equity for the rescission and cancellation of the deed, and the principal question argued both below and here was, whether a chancellor would, after the lapse of so much time, cancel the deed, even if grounds existed for its cancellation at an earlier date ?

Both the auditor and the court below seem to have been of opinion that, regarding the time and circumstances under which the deed was made, the inadequacy of the consideration, if indeed any money was paid, of which there was no evidence except the formal receipt upon the deed, and especially regarding the fact that it was a young man, just of age, conveying his patrimony to a step-father who had already tried, unsuccessfully, to avoid the trust created by the deed of John M. Jordan (see Siter's Appeal, 4 Rawle 468), the deed ought to be set aside in equity, and they found in the long life of the mother, in the Maryland residence, and in the defect of our chancery jurisdiction circumstances to excuse the apparent laches in seeking to avoid the deed. Yet they did not rule the case upon these grounds, but taking all the circumstances into view they decided that the deed created the relation of trustee and *cestui que trust* between Taylor and Jordan, and they proceeded to state an account between them as such, and to decree the fund to Jordan less the proper costs and charges of the trustees.

From this decree the Pennsylvania administrator of Taylor appeals, and assigns for his principal error that the court erred in not awarding the whole fund to him, the appellant. Does the appeal raise any other question upon the record than that of the trust ?

If this had been a formal proceeding in equity by bill filed by Jordan, he would have been obliged to put himself upon the cancellation of his deed, or the execution of the trust created by it. He must have affirmed or disaffirmed it. He could not repudiate and claim under it both in the same suit. And if he had gone for rescinding it, and had convinced the court that it was a catching bargain that ought not to be enforced against him, still he would have encountered that principle of equity that refuses relief to stale demands, and which requires conscience, good faith and reasonable diligence in parties complainant. In Roberts *v.* Tunstall, 4 Hare 262, the Vice-Chancellor assumed that the deed in question there might have been impeached on both grounds assumed against it if the transaction had been of recent occurrence, but on the authority of several cases refused to interpose

after eighteen years' delay to sue, and declared that the principle of the decisions is that after so great delay the injured party must be held to have waived his right to relief—a principle which pre-supposes a right to set aside the transaction independently of that fact.

Nor would we have been likely to find in the circumstances of Jordan an adequate excuse for his delay. He was *sui juris*, and could have sued for the rescission of his deed any time after he made it in 1839. The fact that the expectant estate was sus-pended, as to his right of enjoyment, upon the life of his mother, would not have prevented his clearing and protecting his title. Indeed, good faith required him to impeach Taylor's title in his life-time, whilst he was alive to defend it, and not to lie by till his will was made and the rights of legatees had attached. Nor was there any defect of jurisdiction, for it is shown that the courts of Ma-ryland had full chancery powers, and our courts had them as early as 1840. And even by the Act of 16th June 1836, equity powers were conferred upon this court in the city of Philadelphia to determine " rights of property or money claimed by two or more persons in the hands or possession of a person claiming no right of property therein."

If, therefore, the case were before us upon the question of rescission of the deed of 1839, the authorities applicable to that view of it would have to be discussed more fully than it seems worth while to do at present, but it is apprehended they would conduct us to a conclusion unfavorable to Jordan, and would com-pel us to sustain the deed.

The question, however, with which we have to deal at present is not that, but is a question of trust. We cannot be mistaken in understanding the auditor and the learned judge to have ruled the case on the ground of trust, for the auditor puts the question sharply, " Did Mr. Taylor procure this deed (the assignment of the expectant estate) with a view of making the interest therein conveyed *his own*, or of securing it for his step-son, so that he should not have it in his power, in his unfit condition, to convey it to a stranger ?" And after considering one view of this ques-tion he adopts what he deems a more reasonable conclusion in the following words : " But the more reasonable view to be taken of the transaction is, that Mr. Taylor, regarding his duty as one standing in the relation of a parent, hastened to Philadelphia on learning the condition of affairs, and procured the assignment to be made with a view of securing it for his step-son, so that he could not be defrauded. In this view he would occupy the rela-tion of trustee, and would not be entitled to more of the fund than would reimburse him."

Equally distinct was the language of the learned judge, whose

conclusion was, that "Taylor took this deed to keep the property for Jordan."

And that both the auditor and the court intended these for their final conclusions is shown by the accounts which they respectively stated, and upon which the decree is based. The only question upon the record, then, beyond the dispute about a few dollars on one side or the other of the account, is whether there was evidence to justify the conclusion that Taylor was a trustee.

The evidence is derived from the admitted facts, that the deed was made by an intemperate young man, just of age, for an expectant estate which was his whole patrimony—that there was great danger of his parting with the estate to a stranger for what his guardian called a song—that Taylor was moved to the rescue of the estate from impending sacrifice by the letter to his wife from her brother, and no doubt acted at her instance and with her sanction; that he stood *in loco parentis* to the erring young man, and was bound by that relation to look after his interests, and save them from the ruin which his evil courses were bringing upon them, and that his paternal interposition produced its natural fruits in the reclamation of the step-son, and the salvation of his estate.

Now, if we take the doctrine of the majority of the Supreme Court of the United States in the case of Jenkins v. Pye, 12 Peters 241, that a deed made by a son to his father, as a family arrangement, is not to be viewed with jealousy and suspicion, but is rather to be sustained on less proof and for a slighter consideration than when made to a stranger (which is not the doctrine of the English Chancery), still these facts and circumstances have considerable persuasive power in favor of a trust. Who shall decide that they do not establish the point? No doubt a jury would have found the trust upon such evidence, for there is a naturalness, a verisimilitude about the facts as pointing to that conclusion which would commend them to the understandings of plain men. Taylor did just what most fathers would do to save the son's patrimony, he took it into his own keeping, and hence a jury would almost inevitably infer he took it and kept it for the son. And if *taken* with that intent—if once fixed as trust, his subsequent act in devising it to his grandchildren could not divest him of his liability as trustee, nor Jordan of his rights as a *cestui que trust*.

But the facts have been passed upon, not by a jury, but by an auditor and judge more competent than a jury, and in circumstances more favorable for weighing them correctly than surround us, and is not great deference due to their conclusions? Can we say there was no evidence to lead rational minds to the conviction of a trust? Upon our avowed principles of judging can we say

there was flagrant mistake in this finding ? All primâ facie presumptions are in favor of the decree. Who alleges error must prove it. The auditor and the judge placed themselves upon all the circumstances, they overlooked nóne, they extenuated none, distorted none, and they wrote down what the voice of those circumstances spoke to their ears. Where is the evidence that proves their mistake ? It is to be found only in the unqualified terms of the deed, but if an unqualified grant was necessary to the preservation of the estate, that circumstance is accounted for. Whatever the favor with which a deed from a son to a step-father should be viewed as a family arrangement, it surely ought to have only the operation intended by the parties, and what the parties intended is the general question in the case, which having been found as it has been, we see no grounds upon which we can reverse the finding. We take the record as establishing a matter of fact, upon adequate evidence, and no hesitating doubts of ours as to the existence of that fact can prevail against such a record.

The trust being found, the imputed laches go for nothing, because the time to call for its execution could not arrive till the mother's death. If it be said that Taylor's will was notice to Jordan of an adverse claim to his estate, there were only three years between the date of the will and the institution of proceedings to recover the estate, and no actual disposition of it during that interval under the will, for the life estate did not fall in till 1862. There was nothing in this delay to postpone Jordan's right. Indeed the moment the trust is established the principles alluded to in the early part of this opinion as to backwardness in asserting rights in equity have no such application, as they would have to a question of rescission of the deed. It is not for the trustee to complain that his *cestui que trust* was not more vigilant, especially in view of the promptness with which he acted when the life estate had expired.

What remains of this case relates to the figures of the account. We think the auditor gave satisfactory reasons for not making larger allowances to Taylor, and that the court gave good reasons for the modifications they made in the auditor's statement of the account.

The decree is therefore affirmed, at the costs of the appellant.